Flemming RALK, Plaintiff,

v.

LINCOLN COUNTY, GEORGIA; Edwin L. Bentley, Individually and as Sheriff of Lincoln County, Georgia; David A. Sward, Individually and as Chief Jailer of the Lincoln County Jail; Dr. Robert Williams, Individually and as Physician for Lincoln County Jail; Mary Booker, Individually and as Chief Jailer of the Lincoln County Jail; John Doe 1, Individually and as Physician for the Lincoln County Jail and John Does 2–10, Individually and as Jailers of the Lincoln County Jail, Defendants.

No. CIV. A. CV198–231.

United States District Court,
S.D. Georgia,
Augusta Division.

Jan. 18, 2000.

Joseph D. Wargo (Atlanta, GA), David Pernini (Atlanta, GA), J. Scott Carr (Atlanta, GA), Kristan D.A. Carpenter (Atlanta, GA), John M. Tatum (Savannah, GA), T. Mills Fleming (Savannah, GA), Alan M. Dershowitz (Cambridge, GA), Tyge Trier (Eversheds, Denmark), for plaintiff.

A. Rowland Dye (Augusta, GA), Phillip E. Friduss (Atlanta, GA), Jack G. Slover, Jr. (Atlanta, GA), Chevada D. Grier (Atlanta, GA), for defendant.

## ORDER

MOORE, District Judge.

### I. Introduction

Defendant Robert Williams, M.D. ("Williams"), has filed a motion for sum-

mary judgement (Doc. 108) in which he contends, among other things,[1] that Plaintiff Fleming Ralk ("Ralk") has failed to produce sufficient evidence from which a reasonable jury could find that he violated that Eighth Amendment by being deliberately indifferent to Ralk's allegedly serious medical needs. Williams also contends that he cannot be held liable under the International Covenant on Civil and Political Rights ("ICCPR"). Ralk opposes the motion. After careful consideration, the Court concludes that Williams is entitled to summary judgement. Accordingly, his motion is **GRANTED.**

## II. Background

Plaintiff Fleming Ralk is a Danish citizen who was detained in the Lincoln County Jail between November 25, 1996 and January 30, 1997 while he was awaiting trial on federal criminal charges.[2] In March 1997, a jury acquitted him of all charges. At the time of his detention, Ralk was sixty-nine years old.

Ralk's lawsuit concerns his complaints about his treatment while he was detained at the Lincoln County Jail. Although his complaint sets out several generalized grievances against various Defendants, he seeks to hold Williams liable for refusing to provide him with appropriate medical care. He contends that he sustained a long-term back injury which resulted from the allegedly deficient medical care he received at the Jail. In this regard, Ralk claims that Williams was deliberately indifferent to his serious medical needs.

Williams is a private physician who is not employed by the Lincoln County Jail. Pursuant to a contract, Williams provides medical care on a fee-for-services basis approximately one day a week at the Jail. He normally visits the Jail during lunch time and sees inmates and detainees who are presented to him by the Chief Jailer, Mary Booker ("Booker"). According to Booker, all inmates and detainees are required to fill out a medical care request form and return the form to a jailer before midnight on the Wednesday before Williams visits the Jail. Jailers are supposed to deliver all requests to Booker, and she then screens the requests and compiles a call list for Williams.

Booker testified that she decides who sees Williams on the basis of an inmate's complaint. (Booker Dep. at 120). She also testified that on some occasions she will refuse an inmate's request to see Williams because the request does not, in her opinion, require medical care (i.e.—request for jock itch cream), or because the inmate has already seen Williams recently for the complained-about condition. She stated that when she screens the requests, she discusses with Williams those persons who she refused to present for examination after he has examined all the inmates she has presented. She testified that she would normally tell Williams about the refused inmate's request and explain that inmate's complaint. According to Booker, Williams generally inquired as to whether the refused inmate was still receiving whatever medication he had been prescribed for his condition. Williams would then tell Booker that she should present the refused inmate for examination the following week if his condition did not improve.

1. Williams also argues that he is entitled to summary judgment because the claim against him was not filed within the applicable two-year statute of limitations and that Ralk failed to comply with the requirements of the Prison Litigation Reform Act. Because the Court resolves the motion on its substantive merits, it makes no determination concerning these alternative grounds for judgement.

2. Ralk was apparently confined in the Lincoln County Jail pursuant to an agreement between the United States Marshall's service and the Lincoln County Sheriff. Br. in Support of Motion to Dismiss at 1. Such arrangements are permitted under Georgia law, and the keeper of a county jail has the "same duties and responsibilities toward [a federal detainee] as in the case of inmates committed under the authority of the state." O.C.G.A. § 42–4–9 (1997).

Williams always examined those patients who were presented to him by Booker, and it was her responsibility to make sure that inmates were brought to see Williams in the makeshift examination room at the Jail. (Booker Dep. at 124–25). Williams testified that he is not familiar with the Jail's procedures concerning how inmates get to see him. (Williams Dep. at 39–40). He also testified that he has no discretion over who he sees at the jail and that he has never refused to see any inmate presented to him for examination. (*Id.* at 43). All inmate medical records are kept at the jail, and Booker keeps track of those records. (*Id.* at 47).

Williams has no independent recollection of treating Ralk, although he does remember his name because it was unusual to him. (*Id.* at 10, 35, 61, 71). However, Williams' medical notes concerning Ralk evidence the fact that he examined Ralk two times. Williams first saw Ralk on November 29, 1996. Although Ralk's name appears on the call list for that day, he did not fill out a request to see the doctor. Rather, Williams apparently saw him without a formal request. During that examination, Williams prescribed Ralk Metamucil for constipation and Zovirax for fever blisters. Ralk contends that his constipation was not relieved by this course of treatment.

Williams saw Ralk again on December 19, 1996. During this visit he prescribed Citrucel for constipation and Naprosyn. Naprosyn is a prescription anti-inflammatory drug and is often used to treat muscle aches and back aches. According to Ralk, he had begun to experience back pain for the first time in his life shortly after he was detained at the Lincoln County Jail. He contends that during the December 19, 1996 examination Williams prescribed him a pain killer and a second standard-issue mattress. Williams does not recall giving a prescription for a second mattress. (Williams Dep. at 78). Moreover, Williams also testified that prescribing a second mattress would not make sense, as a person suffering from back pain would likely need a firmer surface, rather than a softer one. (*Id.* at 79). Furthermore, Williams testified that he has never prescribed anything other than medication for back pain. (*Id.*)

Williams did not examine Ralk again, although Ralk contends that he continued to endure severe back pain. Ralk asserts, however, that he submitted to unknown jailers weekly requests to see Williams for the duration of his detention at the Jail. Only two request forms have been submitted into evidence. One request is dated December 18, 1996, and was apparently granted because Williams saw Ralk on December 19, 1996. The second request is dated December 25, 1996, and was apparently never fulfilled. It is not clear why Ralk was not given the opportunity to see Williams again. Williams swore in his affidavit that he never refused to see Ralk, had no idea that Ralk was in further pain or requested further treatment, and did not partake in any decision after December 19, 1996, regarding Ralk's medical care. (Williams Aff. at ¶¶ 6 & 7).[3] As for the remaining requests, there is no documentary evidence of their existence. Moreover, Booker contends that all forms are given to her, filed, and stored under lock and key. (Booker Dep. at 129).

---

**3.** Ralk argues that Williams' deposition testimony is inconsistent with his affidavit. In his deposition, Williams testified that he did not remember Ralk; however, in his affidavit he swore that he never refused to treat Ralk. Ralk contends that if Williams truly did not remember Ralk, he could not honestly testify that he did not refuse to treat him, as he has no memory of Ralk. The Court finds this argument disingenuous. It is entirely logical to suppose that Williams did not individually remember Ralk, but that he is sure that he never refused to treat Ralk. It is consistent to suppose that Williams' ordinary practice is to never refuse to see a patient, even if he cannot, in retrospect, remember each patient he has treated. Thus, the purported "contradiction" between Williams' affidavit and his deposition testimony does not, on its own, create some sort of factual ambiguity or credibility issue that necessitates jury resolution.

Although what happened to Ralk's December 25, 1996 request and any subsequent requests is not clear from the record, Booker testified as to how she believes she likely would have handled Ralk' December 25, 1996 request to see Williams. This portion of her deposition is quite confusing; nevertheless, it is clear that she cannot remember any specific conversation that she had with Williams about Ralk, if in fact she had one. Concerning how she believes she likely would have handled Ralk's request, Booker testified:

A: All right. This might be a case, like I told you once before, stomach and back pain. Okay. That's 25th [sic] of December when he put the slip in.

Q: The 25th of December, yes, ma'am.

A: Yes. So I probably told him about he still complaining about his stomach and back pain.

Q: You probably told who?

A: Dr. Williams and Dr. Williams says, is he still taking his medication? I say, yes, sir, he's still taking it. So he said, well, keep him on it a while. Even then if he's still complaining, get the slip, and I'll check him next time I come.

Q: Do you remember that happening or do you remember that conversation with Dr. Williams?

A: I can't really put a finger on it, but in this case we'll have them like that.

. . .

Q: Is this something that you may have even decided on your own that I don't need to talk to Dr. Williams about or is this something—

A: No, I didn't decide this on my own, no.

Q: You talked to Dr. Williams about that?

A: Yes.

Q: Do you remember talking to Dr. Williams or do you think that that's what you would have done?

A: I can't really pin because I think I talked to Dr. Williams about this one right here about the back pain and stomach.

Q: You can't be sure though?

A: No, sir. I can't be sure. But I think that's what I did because I had the file out and everything. I had his file out and everything.

Booker Dep. at 145–47. Ralk has not presented any other evidence that Williams was aware of his further complaints of back pain and refused to see him.

### III. Analysis

#### A. Summary Judgement Standard.

Summary Judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56 advisory committee's note). The Court's analysis ends "where there is no genuine issue of material fact and where the moving party is entitled to judgment as a matter of law." *Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller*, 957 F.2d 1575, 1578 (11th Cir.), *cert. denied by, Chevron Transport Corp. v. Great Lakes Dredge & Dock Co.*, 506 U.S. 981, 113 S.Ct. 484, 121 L.Ed.2d 388 (1992); *Real Estate Fin. v. Resolution Trust Corp.*, 950 F.2d 1540, 1543 (11th Cir.1992) (both citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548;

*Tidmore Oil Co. v. BP Oil Co./Gulf Prods. Div., a Div. of BP Oil Co.,* 932 F.2d 1384. 1387–88 (11th Cir.1991), *cert. denied,* 502 U.S. 925, 112 S.Ct. 339, 116 L.Ed.2d 279 (1991). The substantive law governing the action determines whether an element is essential. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *DeLong Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499, 1505 (11th Cir.1989), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. *Thompson v. Metropolitan Multi–List, Inc.,* 934 F.2d 1566, 1583 n. 16 (11th Cir. 1991), *cert. denied,* 506 U.S. 903, 113 S.Ct. 295, 121 L.Ed.2d 219 (1992); *Chanel, Inc. v. Italian Activewear of Fla., Inc.,* 931 F.2d 1472, 1477 (11th Cir.1991). A dispute of material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. If the nonmoving party's response to the summary judgment motion consists of nothing more than mere conclusory allegations, then the court must enter summary judgment in the moving party's favor. *Peppers v. Coates,* 887 F.2d 1493, 1498 (11th Cir.1989). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, [then] there is no genuine issue for trial." *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *See Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505; *Johns,* 927 F.2d at 556.

In assessing whether the movant is entitled to summary judgment in its favor, the district court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. *Welch v. Celotex Corp.* 951 F.2d 1235, 1237 (11th Cir.1992); *Ryder Int'l Corp. v. First Am. Nat'l Bank,* 943 F.2d 1521, 1523 (11th Cir.1991). The Court must avoid weighing conflicting evidence, *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505; *McKenzie v. Davenport–Harris Funeral Home,* 834 F.2d 930, 934 (11th Cir.1987). A mere "scintilla" of evidence supporting the opposing party's position, however, will not suffice. *E.g., Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton,* 883 F.2d 923, 933–34 (11th Cir.1989) (citation omitted).

### B. Williams is Entitled to Summary Judgement.

#### 1. Introduction

Although Ralk's claims against Williams focus solely on the medical care he provided or failed to provide, he has advanced counts against Williams under both 42 U.S.C. § 1983 and the International Covenant on Civil and Political Rights. The Court will examine each count separately.

#### 2. Deliberate Indifference Claim

Ralk claims that Williams' conduct violated his constitutional rights. "Conditions of confinement imposed prior to conviction are limited . . . by the due process clause of the fourteenth amendment." *Hamm v. DeKalb County,* 774 F.2d 1567, 1572 (11th Cir.) *cert. denied,* 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986). "In regard to providing pretrial detainees with such basic necessities as food, living space, and medical care, the minimum standard al-

lowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons." *Id.* at 1574.

■ In order to prevail on his constitutional claim, Ralk must demonstrate that Williams was deliberately indifferent to his serious medical needs. "Deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir.1999). A prison official or doctor like Williams cannot be held liable "under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994).

■ "An official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as infliction of punishment." *Id.* at 838, 114 S.Ct. at 1979. "Thus, the official must have a subjectively sufficiently culpable state of mind." *Campbell v. Sikes,* 169 F.3d 1353, 1364 (11th Cir.1999) (internal citations omitted). "Likewise, in addition to the subjective awareness of the relevant risk, *Estelle* requires that plaintiff show more than mere negligence to establish a violation of the Eighth Amendment and defeat a prison official's motion for summary judgement." *McElligott,* 182 F.3d at 1255 (citing *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). However, a "delay in treatment can, depending on the circumstances and the length of the delay, constitute deliberate indifference." *Hinson v. Edmond,* 192 F.3d 1342, 1348 (11th Cir.1999) (citing *Lancaster v. Monroe County,* 116 F.3d 1419, 1425 (11th Cir.1997); *Harris v.*

*Coweta County,* 21 F.3d 388, 394 (11th Cir.1994)).

"To survive defendant's motion for summary judgement, [inmate] is required to produce evidence sufficient to create a genuine issue of material fact about whether [defendant treating physician] (1) had subjective knowledge of [inmate's] serious medical condition, and (2) was deliberately indifferent to that condition." *Hinson,* 192 F.3d at 1348 (citing *Lancaster,* 116 F.3d. at 1425). "So, [inmate] must show sufficient evidence to create a material issue of fact about whether [defendant treating physician] knew of [inmate's] serious medical condition and, intentionally or with reckless disregard, delayed treatment." *Hinson,* 192 F.3d at 1348 (citing *Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir.1986) (to establish that health care provider's acts constitute deliberate indifference to serious medical need, treatment must be so grossly incompetent, inadequate, or excessive as to shock conscience or to be intolerable to fundamental fairness)). Finally, "[s]ummary judgement must be granted for the defendant official unless the plaintiff presents evidence of the official's subjective knowledge, as follows: 'since a finding of deliberate indifference requires a finding of the defendant's subjective awareness of the relevant risk, a genuine issue of material fact exists only if the record contains evidence, albeit circumstantial, of such subjective awareness.'" *Campbell* 169 F.3d at 1364 (quoting *Steele v. Shah,* 87 F.3d 1266, 1269 (11th Cir.1996)).

■ In support of his motion, Williams argues that he treated Ralk when Ralk was presented to him and had no further contact with him. Furthermore, he contends that he never denied Ralk medical treatment and never took part in any decision to deny Ralk care. Ralk argues that Booker's deposition testimony concerning how she handled medical care requests creates a material issue of fact concerning Williams' alleged deliberate indifference to

his medical needs. After a careful review of the evidence presented, the Court concludes that Booker's testimony does not create a jury issue and that Williams is entitled to summary judgement on this count.

Several reasons support the Court's conclusion that Williams is entitled to summary judgement. First, Booker never gave clear testimony about any particular conversation she had with Williams concerning Ralk's December 25, 1996 request to see a doctor. Throughout her deposition, she equivocated and spoke evasively about whether she ever discussed the request with Williams. See Booker Dep. at 145–147 ("I can't really pin," "I can't be sure," "This might be a case where," "I can't really put a finger on it"). More importantly, she never made an affirmative statement that she told Williams that Ralk was still suffering back pain and that Williams then stated that he would not see Ralk. Thus, Booker's testimony does not provide evidence that Williams actually had subjective knowledge of Ralk's condition. Even if the Court speculated that Booker actually spoke with Williams about Ralk because she testified that she would normally discuss this type of situation with him, there is no evidence that he then intentionally or recklessly denied Ralk access to medical care.

Second, even if the evidence established that Williams knew about Ralk's condition, that he asked Booker whether Ralk had been taking his prescribed medication, and that Williams said that she should present Ralk to him the following week, this would not establish deliberate indifference. Such a course of medical care does not "shock the conscience," nor would it be "so inappropriate as to evidence intentional mistreatment or a refusal to provide essential care." See Rogers, 792 F.2d at 1058. Supposing that Williams decided that Booker should present Ralk the following week if he was still in pain, allowing a patient with a back ache to endure another week of prescribed treatment would not constitute deliberate indifference. Cf. Adams v. Poag, 61 F.3d 1537, 1546 (11th Cir.1995) (doctor's course of treatment did not rise above negligence to level of deliberate indifference).

Third, even though Ralk testified that he filled out several additional requests for medical care and handed them to jailers, there is absolutely no evidence in the record that Williams was ever aware of these additional requests. The fact that there is no documentary evidence of these additional requests does not conclusively establish that Ralk did not make them. Indeed, the Court cannot conclude that the requests were never made, as Ralk testified that he submitted these forms. However, no evidence has been presented that Booker ever received these requests or that she ever discussed them with Williams. Ralk testified that he handed the requests to jailers. (Ralk Dep. at ). Booker testified that she never denied Ralk the opportunity to see a doctor. (Booker Dep. at 130). Similarly, Williams swore that he never took part in any decision to deny Ralk medical care. (William Aff. at ¶¶ 6 & 7). There is absolutely no evidence that Williams ever received notice of these additional requests. Booker's generalized explanation about how she would handle inmates' denied requests does not show that Williams had any knowledge of Ralk's additional requests. There is simply no evidence that Williams had subjective knowledge of these additional requests, or that he intentionally denied Ralk access to medical care.

Finally, Williams has denied that he ever refused to treat anyone, and Booker's testimony does not contradict this. Rather, her testimony establishes that sometimes she would make the decision not to present an inmate who had requested an examination and that she would then discuss these individuals with Williams after he finished seeing the inmates on his call list. According to Booker, she and Williams discussed those individuals and Williams told her to present them to him

the following week if their conditions persisted. Booker is the final authority at the Jail, and she compiles the list of inmates who Williams sees when he makes his weekly visits to the Jail. (Booker Dep. at 18, 120). Williams merely examines the inmates who are presented to him. (Williams Dep. at 42).

In the light most favorable to Ralk, the evidence shows that Booker might have told Williams that she did not present Ralk for treatment for his December 25 request and that Williams then might have inquired about whether Ralk had been taking his medication and might have told Booker that if Ralk kept taking his medication and was not better that she should bring him to see Williams the following week. A reasonable trier of fact could not, on the basis of this evidence, find that Williams was deliberately indifferent to Ralk's allegedly serious medical needs. Accordingly, Williams is entitled to summary judgement on this claim.

### 3. ICCPR Claim

Ralk also claims that Williams violated the United Nations International Covenant on Civil and Political Rights. The ICCPR is an international treaty to which the United States is a party. In his amended complaint, Ralk does not specify how Williams allegedly violated the ICCPR. Rather, he contends that "Defendants" violated Article 10 of the ICCPR. Article 10 of the ICCPR provides in relevant part:

1. All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person.

2.(a) Accused persons shall, save in exceptional circumstances, be segregated from convicted persons and shall be subject to separate treatment appropriate to their status as unconvicted persons;
. . .

3. The penitentiary system shall comprise treatment of prisoners the essential aim of which shall be their reformation and social rehabilitation.

*See International Covenant on Civil and Political Rights,* 6 I.L.M. 368 (1969).

Because Ralk lumped all the Defendants together, it is difficult for the Court to ascertain how Ralk contends Williams violated the ICCPR. In the amended complaint, Ralk asserts that "Defendants" specifically violated the ICCPR in the following ways: (1) denying his right to communicate with the outside world (¶ 74); (2) depriving him of reading materials and clothing (¶ 80); and (3) failing to provide him with adequate medical treatment or heeding the recommendations of his treating physician (¶ 82). *See* Second Amended Complaint (May 14, 1999). Only the last of these allegations is applicable to Williams.

Ralk also makes generalized allegations that the Defendants violated the ICCPR by degrading him (¶ 83), by failing to ensure minimum standards for humane treatment (¶ 79), and by failing to treat him with humanity (¶ 78). *See* Second Amended Complaint (May 14, 1999). The record reveals that Williams and Ralk only interacted during the two examinations. Furthermore, Williams was in no manner responsible for the conditions of Ralk's confinement. Accordingly, the Court concludes that Williams cannot be held responsible for any of these more generalized allegations.

Thus, to the extent that Ralk seeks to hold Williams liable under the ICCPR, it appears to the Court that Ralk only contends that Williams was involved in providing him with inadequate medical care. In his motion for summary judgement, Williams argues that the ICCPR does not provide for a private right of action. He contends that he is entitled to summary judgement on this ground only.

The United States signed the ICCPR in 1977, but the President did not ratify it until after the Senate consented in 1992. *See* John Quigley, *The International Covenant on Civil and Political Rights and the Supremacy Clause,* 42 DEPAUL L. REV.

1287, 1289 (1993). When the Senate offered its advice and consent, it did so under the declaration "[t]hat the United States declares that the provisions of Articles 1 through 27 of the Covenant are not self-executing." 138 Cong. Rec. S4781-01, S4784 (April 2, 1992). This declaration is identical to the one posited by President Bush when he proposed numerous conditions to the Senate Committee on Foreign Relations. *See Senate Committee on Foreign Relations Report on the International Covenant on Civil and Political Rights,* 31 I.L.M. 645, 652 (1992) (stating "The Administration proposed a declaration stating that Articles 1 through 27 of the Covenant are not self-executing"). The Bush Administration explained the "not self-executing" declaration in the following manner: "The intent is to clarify that the Covenant will not create a private cause of action in U.S. courts." *Id.* at 657.

 It is therefore clear from the Legislative and Executive materials that neither branch intended the ICCPR to be self-executing. *See generally,* David Sloss, *The Domestication of International Human Rights; Non–Self–Executing Declarations and Human Rights Treaties,* 24 YALE.J.INT'L.L. 129 (1999) (exploring in excellent detail the meaning of "not self-executing" limitations in several major international human rights treaties). The Eleventh Circuit has declared "that a treaty must be self-executing in order for an individual citizen to have standing to protest a violation of the treaty." *United States v. Thompson,* 928 F.2d 1060, 1066 (11th Cir.) *cert. denied,* 502 U.S. 897, 112 S.Ct. 270, 116 L.Ed.2d 222 (1991). Indeed, the Eleventh Circuit's command is consistent with the Bush Administration's understanding of the term "not self-executing."

On the basis of the foregoing, the Court concludes that because the ICCPR is not self-executing, Ralk can advance no private right of action under that document.

Moreover, the Court is aware of no judicial decision authorizing a private right of action under the ICCPR, while several decisions have prohibited such use. *See e.g., Igartua De La Rosa v. United States,* 32 F.3d 8, 10 n. 1 (1st Cir.) *cert. denied,* 514 U.S. 1049, 115 S.Ct. 1426, 131 L.Ed.2d 308 (1995); *White v. Paulsen,* 997 F.Supp. 1380, 1387 (E.D.Wash.1998). The Court's conclusion on this matter should come as no surprise to Ralk, as the Court expressed concern and raised the issue in its Order dated June 4, 1999.

At the Court's request, Ralk submitted a letter brief to the Court and counsel for the Defendants in which he argued that the Eleventh Circuit has permitted private plaintiffs to sue for violations of the ICCPR. Ralk cites *Abebe–Jira v. Negewo,* 72 F.3d 844 (11th Cir.), *cert. denied,* 519 U.S. 830, 117 S.Ct. 96, 136 L.Ed.2d 51 (1996), in which the Eleventh Circuit affirmed the unreported opinion of the Northern District of Georgia. In its affirmation, the Eleventh Circuit ruled that a private right of action exists under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350.[4] *Abebe–Jira,* 72 F.3d at 848. While the Eleventh Circuit's decision makes no mention of the ICCPR, it appears to approve tacitly the district court's use of the ICCPR as a means of construing violations of "the law of nations or a treaty of the United States." *See Abebe–Jiri v. Negewo,* 1993 WL 814304, *4 (N.D.Ga.1993) (stating "The prohibition of such treatment [cruel, inhuman and degrading treatment] is found in all of the major international human rights treaties, including the International Covenant on Civil and Political Rights").

On the basis of the Eleventh Circuit's *Abebe–Jiri* decision, it appears to the Court that Ralk could bring a claim under the Alien Tort Claims Act for violations of the ICCPR. However, despite his statement that he would "amend his Complaint

---

4. The Alien Tort Claims Act provides, "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

to clarify that the ATCA provides the enabling legislation to support his ICCPR claim, should the Court so require," he has failed to make any motion to amend his complaint. *See* Letter Brief dated June 16, 1999 at p. 4 n. 3 (attached to Ralk's Br. in Opp. as Ex. H). As the case now stands, Ralk has advanced two substantive claims: one under 42 U.S.C. § 1983 and one directly under the ICCPR.

In his letter brief, Ralk also petitions the Court to use the ICCPR to construe his rights under his § 1983 claim. However, Ralk also has failed to make an appropriate motion to amend his complaint in this regard. As his complaint now stands, his count under § 1983 only seeks compensation for violations of the Eighth and Fourteenth Amendments. As the Court already has determined, Williams is entitled to summary judgement on this count. "It is not the province of the Court to raise issues on behalf of the litigants before it." *U.S. v. Burkhalter,* 966 F.Supp. 1223, 1225 n. 4 (S.D.Ga.1997).

In addition to the fact that Ralk has failed to move the Court to allow him to amend the complaint, the Court cannot fathom how Williams could be held liable for substantive violations of the ICCPR, regardless of how such a claim might be presented. As the Court previously deduced, Ralk could only be seeking to recover against Williams for violations of his ICCPR rights as they pertain to the adequacy of the medical care he received. The Court has already analyzed Ralk's allegations about Williams' role in his medical care and determined that no reasonable jury could determine that Williams violated the Eighth Amendment standards of deliberate indifference. Thus, in order for Ralk to hold Williams liable for the adequacy of his medical care under Article 10 of the ICCPR, that provision would have to require a higher degree of medical care for pre-trial detainees than the level required by our Constitution.

The Court has been unable to uncover any precedent directly addressing this issue. However, one of the explicit reservations to the ICCPR expressed by both the Senate and the Bush Administration leads the Court to believe that Article 10 does not provide higher standards for detainee medical care than the Eighth Amendment. That reservations states, "[t]hat the United States considers itself bound by Article 7 to the extent that "cruel, inhuman or degrading treatment or punishment" means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth and/or Fourteenth Amendments to the Constitution of the United States." *See* 138 Cong. Rec. S4781–01, *S4783 (April 2, 1992). Article 7 of the ICCPR states that "[n]o one shall be subjected to torture or cruel, inhuman, or degrading treatment or punishment. In particular, no one shall be subjected without his free consent to medical or scientific experimentation." *See International Covenant on Civil and Political Rights,* 6 I.L.M. 368 (1969).

Article 10 of the ICCPR makes no specific provision for inmate medical care; it only requires that persons deprived of their liberty be treated with humanity and dignity. *See International Covenant on Civil and Political Rights,* 6 I.L.M. 368 (1969). The Senate Committee on Foreign Relations expressed the view that "The overwhelming majority of the provisions in the Covenant are compatible with existing U.S. domestic law." *See Senate Committee on Foreign Relations Report on the International Covenant on Civil and Political Rights,* 31 I.L.M. at 650. While it is conceivable that Article 10 requires some higher degree of medical care than that required by our Constitution, the Court finds no reasonable basis for such a conclusion.

In fact, reason leads the Court to conclude that, with regard to the standards of medical care that a pre-trial detainee is entitled to, to the degree that Article 10 of the ICCPR confers any right to medical care for a pre-trial detainee, the adequacy of that medical care should be measured

by the same well-honed standards that our Constitution requires. Our Courts analyze inmate or pre-trial detainee medical care under the Eighth Amendment's prohibition on cruel and unusual punishment. Where similar "cruel punishment" language appears in the ICCPR at Article 7, the Senate and President both expressly stated that those terms should be construed as synonymous with the types of punishment forbidden by our Constitution. *See Senate Committee on Foreign Relations Report on the International Covenant on Civil and Political Rights*, 31 I.L.M. at 651, 654, 659; *Cf. White v. Johnson*, 79 F.3d 432, 440 n. 2 (5th Cir.) *cert. denied* 519 U.S. 911, 117 S.Ct. 275, 136 L.Ed.2d 198 (1996)(stating that if it had to interpret a claim under the ICCPR regarding cruel treatment, it would do so under the standards developed for the Eighth Amendment). Ralk could have just as easily stated that Williams' medical care violated Article 7, and there would be no doubt that the Court would then utilize the Eighth Amendment's deliberate indifference standard. Indeed, it would appear that a claim for inadequate medical care would more appropriately be considered under Article 7 of the ICCPR. *See* General Comment 20, United Nations Human Rights Committee (1992)[5] (interpreting Article 7 and stating that "[t]he protection of the detainee also requires that prompt and regular access be given to doctors");

and General Comment 21, United Nations Human Rights Committee (1992) (stating that "Article 10, paragraph 1, imposes on States parties a positive obligation towards persons who are particularly vulnerable because of their status as persons deprived of liberty, and complements for them the ban on torture or other cruel, inhuman or degrading treatment or punishment contained in article 7 of the Covenant ... [and] neither may [detainees] be subjected to any hardship or constraint other than that resulting from the deprivation of their liberty").[6]

There is no principled reason for the Court to envision some greater level of protection simply because Ralk claimed that Williams' medical care violated the open-ended, nebulous concepts of humanity and dignity found in Article 10. There is simply no indication that either the President or the Senate intended to confer higher standards of adequate medical care under the ICCPR. Moreover, such a reading of Article 10 is entirely consistent with our domestic law, as the President intended. *See Senate Committee on Foreign Relations Report on the International Covenant on Civil and Political Rights*, 31 I.L.M. at 650.

Accordingly, even if Ralk had provided the Court with appropriate motions and the Court granted such motions, the Court

---

**5.** The ICCPR established a Human Rights Committee which is given certain functions under the ICCPR. *See* Part IV (Articles 28–45), *International Covenant on Civil and Political Rights*, 6 I.L.M. 368 (1992). One of its enumerated functions is to produce "such general comments as it may consider appropriate." *Id.* at Article 40 ¶ 4. The text of the Human Rights Committee General Comments may be located on the United Nations Human Rights Website (www.unhchr.ch).

**6.** The Court realizes that it has not dismissed the ICCPR claims against the remaining Defendants, as no appropriate motions were ever presented. If the Court does in fact reach the substantive merits of these claims (which include allegations for not only medical care but also deprivation of clothing and reading materials, as well as a denial of com-

munication with family), it will be inclined to treat the requirements of Article 10 as coterminous with applicable United States' constitutional standards under the Eighth Amendment. To the degree Ralk claims that Article 10 grants him greater rights than our Constitution, he must be prepared to provide detailed authority for these assertions at the pretrial conference scheduled for January 26, 1999. The remaining Defendants also should be prepared to discuss the applicability of the ICCPR at that time. The Court has been unable to locate any authority suggesting that Article 10 reaches beyond our constitutional minima, and it is very skeptical of charting out a new course in the realm of human rights when our great constitutional tradition has already cleared a well-worn path.

would find that Williams' could not be held liable under the ICCPR for the same reasons that he could not be held liable under the Eighth Amendment. Therefore, Williams is entitled to summary judgement on Ralk's claim under the ICCPR.

## IV. Conclusion

For the foregoing reasons, the Court concludes that Williams is entitled to summary judgement in this case. A reasonable trier of fact could not find that he was deliberately indifferent to Ralk's allegedly serious medical needs. Furthermore, he is also entitled to summary judgment on the ICCPR claim. Accordingly, Williams' motion for summary judgement is **GRANTED.** Defendant Williams is hereby **DISMISSED FROM THE CASE.**

Ralk has also filed a motion to file a second supplemental brief in opposition (Doc. 128)and a motion pursuant to Fed. R.Civ.P. 56(f) seeking further, limited discovery. (Doc. 129). Those motions refer solely to issues surrounding alternative summary judgement arguments which the Court found unnecessary to reach. As the Court has reached a determinative ruling on the substantive liability issue, those motions are **DENIED AS MOOT.**