# United States Court of Appeals

## For the First Circuit

No. 04-2186

GREGORIO IGARTÚA-DE LA ROSA, ET AL.,

Plaintiffs, Appellants,

v.

UNITED STATES OF AMERICA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Raymond L. Acosta, U.S. Senior District Judge]

Before

Torruella, Circuit Judge,
Campbell, Senior Circuit Judge,
and Howard, Circuit Judge.

Gregorio Igartúa-de la Rosa, pro se.
Gregory G. Katsas, Deputy Assistant Attorney General, with
whom Peter D. Keisler, Assistant Attorney General, H.S. García,
United States Attorney, Michael Jay Singer and Matthew M. Collette,
Attorneys, Appellate Staff, Civil Division, were on brief, for
appellee.

October 14, 2004

**Per Curiam**.[1]  Gregorio Igartúa de la Rosa ("Igartúa") brings his federal constitutional appeal to us a third time, contending that his inability to vote for the President and Vice-President of the United States of America on account of his residency in Puerto Rico is a redressable violation of his right to equal protection as a United States citizen.  We affirm the district court's dismissal of his claim, relying on our prior dispositions in Igartúa de la Rosa v. United States, 32 F.3d 8 (1st Cir. 1994), cert. denied, 514 U.S. 1049 (1995) ("Igartúa I") and Igartúa de la Rosa v. United States, 229 F.3d 80 (1st Cir. 2000) ("Igartúa II").  In Igartúa II, referring to Igartúa I, we noted that "this court held with undeniable clarity that the Constitution of the United States does not confer upon United States citizens residing in Puerto Rico a right to participate in the national election for President and Vice-President."  Igartúa II, 229 F.3d at 83.

Our prior opinions canvass the relevant constitutional landscape.  Igartúa II, 229 F.3d at 83-84; Igartúa I, 32 F.3d at 9-11.  We need only observe that Igartúa has raised no argument that would bring the matter outside the usual "rule that earlier decisions are binding." Igartúa II, 229 F.3d at 84 (discussing the two exceptions to the rule).  Under First Circuit precedent, a panel such as ourselves is bound in the present circumstances by a

---

[1]  Campbell, Senior Circuit Judge and Howard, Circuit Judge.

-2-

prior panel's ruling.  Only the en banc court, i.e. all the judges of the First Circuit sitting together, can alter a prior panel precedent.  See Williams v. Ashland Eng'g Co., Inc., 45 F.3d 588, 592 (1st Cir. 1995) ("An existing panel decision may be undermined by controlling authority, subsequently announced, such as an opinion of the Supreme Court, an en banc opinion of the circuit court, or a statutory overruling.").  And, of course, the Supreme Court of the United States may, by certiorari or subsequent precedent, overrule a circuit opinion.  Id.  Indeed, it seems apparent that a definitive constitutional ruling of the magnitude sought here can, in the final analysis, only emanate authoritatively from the Supreme Court itself.

**Affirmed**.

**(Dissenting Opinion follows.)**

**TORRUELLA**, <u>Circuit Judge</u> **(Dissenting)**.  David Hume, that

most seminal of British philosophers, in his essay <u>That Politics</u>

<u>May Be Reduced To A Science</u>,[2] stated that "[i]t may easily be

observed that though free governments have been commonly the most

happy for those who partake of their freedom, yet are they most

ruinous and oppressive to their provinces."  Although this was a

statement made with more direct reference to England's relationship

to Ireland and its people, it is not one that is totally irrelevant

to that between the United States and Puerto Rico and the four

million United States citizens who reside there.

If on the one hand it can be argued that Puerto Rico and

its "citizens" are better off materially than they were when the

island was invaded 106 years ago,[3] the undeniable fact is that it

---

[2]  David Hume, <u>Political Essays</u> 15 (Charles W. Hendel ed., 1953).

[3]  The estimated infant mortality rate for 2004 is 8.37 deaths per 1,000 live births.  Central Intelligence Agency, <u>World Factbook</u> (2004), Puerto Rico, <u>available at</u> http://www.odci.gov/cia/publications/factbook/print/rq.html (last visited Oct. 8, 2004).  Life expectancy is 77.49 years.  <u>Id.</u>  The death rate is 7.77 per thousand, and the birth rate is 14.1 births per thousand.  <u>Id.</u>  The literacy rate is 94.1%.  <u>Id.</u>  Gross Domestic Product ("GDP") per capita in 2003 was $16,800.  <u>Id.</u>  In 1933, in comparison, the infant mortality rate was 139.4 deaths per 1,000 live births.  <u>Compendio de Estadísticas Sociales - 1981</u>, P.R. Planning Board, San Juan (1982).  Life expectancy in 1902 was 36.36 years.  <u>Id.</u>  The birth rate in 1900 was 40.5 births per thousand. <u>United States-Puerto Rico Commission on the Status of Puerto Rico</u> 151, Table C1-5 (1966).  The death rate in 1900 was 25.3 per thousand.  <u>Id.</u>  Literacy in 1899 was 20.4%.  José Vázquez Calzada, <u>La Población de Puerto Rico y su Trayectoria</u> 82, tbl.59 (1978) (unpublished).  GDP per capita in 1930 was $122.  Daniel Creamer, <u>The Net Income of the Puerto Rican Economy 1940-1944</u>, at 21-22 (n.d.).  In the fiscal year 2000, federal expenditures in Puerto

has been, and continues to be, at the basement of the American hegemony. One indicium of this condition is its comparative economic condition. Its residents have an annual per capita income of $16,800 in contrast with those of Mississippi, the poorest state, at $23,448 per capita. It is even more disparate if we look to the national average, which is $37,800.[4] The unemployment rates officially average over 11%, although they are de facto much higher. Even at the official rate, however, they stand at twice the national average.[5] While these dismal statistics prevail, Puerto Rico is second only to Mexico as a market for U.S. goods in Latin America[6] and several billion dollars are "repatriated"

---

Rico amounted to $12.1 billion. Bureau of the Census, U.S. Dep't. of Commerce, <u>Consolidated Federal Funds Report</u> (2000), <u>available at</u> http://www.census.gov/prod/2001pubs/cffr-00.pdf.

[4] Current income figures come from the Central Intelligence Agency, World Factbook, and the U.S. Department of Commerce, Bureau of Economic Analysis. As a matter of historical comparison, in 1930, Puerto Rico had a per capita GDP of $122, compared to Mississippi's $202 and the overall U.S. figure of $619. 62 Bureau of Economic Analysis, U.S. Dep't. of Commerce, <u>Survey of Current Business</u>, 8 (Aug. 1982).

[5] Bureau of Labor Statistics, U.S. Dep't of Labor.

[6] During July to December 2003, Puerto Rico received $8.65 billion in U.S. exports, leading Brazil, the next largest market for U.S. exports in Latin America, which received $5.98 billion during that period. Mexico received $50.82 billion in U.S. exports during the same period, a figure more than four times smaller than Puerto Rico's, once adjusted for population. <u>Making Manufacturing Operations in Puerto Rico More Competitive</u>, 29 Puerto Rico Business Review 1, (Mar. 2004); <u>U.S. Trade (Imports, Exports and Balance) by Country</u>, Foreign Trade Statistics, U.S. Census Bureau, <u>available at</u> http://www.census.gov/foreign-trade/balance/index.html.

annually from Puerto Rico to the Mainland by U.S. based companies doing business in Puerto Rico,[7] while sheltered from the I.R.S.[8] Meanwhile, while nearly half of the population of Puerto Rico lives below the poverty level,[9] compared to 12.5% in the United States,[10] the Supreme Court in Harris v. Rosario, 446 U.S. 651 (1980), validated the discriminatory treatment by Congress in the payment of Social Security benefits to Puerto Rico residents vis-à-vis those on the Mainland, stating as one of the grounds for this outcome that granting the same benefits to the residents of Puerto Rico could disrupt the local economy. Id. at 651. See also Califano v. Torres, 435 U.S. 1, 5 n.7 (1978). It should be noted that Puerto Rico residents pay the same Social Security tax as the citizens who reside in the states and receive full benefits.

---

[7] Ingresos Netos al Fondo General del Gobierno Estatal, Departamento de Hacienda, Gobierno de Puerto Rico, available at (showing amounts paid in so-called "toll gate" tax to the Commonwealth of Puerto Rico on capital exiting the island).

[8] The income tax provisions of the Internal Revenue Code are inapplicable to most income derived from Puerto Rico sources. 26 U.S.C. § 933. This is an irrelevant benefit to most residents of Puerto Rico because of their low income levels. United States companies are able to "repatriate" income pursuant to I.R.C. § 30A. 26 U.S.C. 30A.

[9] The poverty rate in Puerto Rico in 2000 was 48.2%. Personas por Debajo del Nivel de Pobreza por Municipio, Censo de 2000, Oficina del Censo, Gobierno de Puerto Rico, available at, http://www.censo.gobierno.pr/Censo_Poblacion_Vivienda/Datos_Histo ricos/Datos_Nivel_Pobreza_2000.htm.

[10] Income, Poverty, and Health Insurance Coverage in the United States: 2003, U.S. Department of Commerce, Economics and Statistics Administration, U.S. Census Bureau.

This brief and admittedly superficial synopsis of some of the conditions extant in the relationship between the United States and its citizens in Puerto Rico, does not, of course, tell the whole picture or even the most important components of this lopsided situation.[11] Together with others of a more fundamental kind, however, they manifestly establish the colonial nature of the U.S.-Puerto Rico relationship.[12]

The conundrum created by the Insular Cases[13] and People v. Balzac, 182 U.S. 298 (1922), not only gives underlying support to this subservient condition, but more importantly, it relegates the U.S. citizens who reside in Puerto Rico to perpetual inequality by insulating the political branches of government from any effective pressure from these citizens, who have neither voting representation in Congress nor the right to vote for the offices of

---

[11] For a starter, see Juan R. Torruella, The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal (1984).

[12] See José Trías Monge, Puerto Rico: The Trials of the Oldest Colony in the World (1997).

[13] Ocampo v. United States, 234 U.S. 91 (1914); Dorr v. United States, 195 U.S. 138 (1904); Hawaii v. Mankichi, 190 U.S. 197 (1903); Downes v. Bidwell, 162 U.S. 244 (1901); Dooley v. United States, 182 U.S. 222 (1901); De Lima v. Bidwell, 182 U.S. 1 (1901). In a nutshell, these cases created the status of unincorporated territory whereby Puerto Rico, Guam and the Philippine Islands were held to be subject to Congress's plenary power pursuant to the territorial clause of the Constitution. See U.S. Const. art. IV, § 3, cl. 2. Together with the ruling in Balzac, decided after the grant of U.S. citizenship to the residents of Puerto Rico, the Court decided that only "fundamental rights" under the Constitution were extended to Puerto Rico. See Balzac, 258 U.S. at 312-13.

President and Vice-President. Additionally, the laws enacted by Congress are applied to them without their participation in their enactment, or consent in their application. This abusive shield and undemocratic condition can only be penetrated by the unpolitical branch of government. Only the judicial branch can correct this denigrating and unacceptable condition, one which was created in the first place by that branch in the Insular Cases, et al.

The dead end with which these citizens are today faced was forecast by Justice Harlan in his dissent in Downes when he said: "The idea that this country may acquire territories anywhere upon the earth, by conquest or treaty, and hold them as mere colonies or provinces -- the people inhabiting them to enjoy only those rights as Congress chooses to accord to them -- is wholly inconsistent with the spirit and genius, as well as with the words, of the Constitution." Downes, 182 U.S. at 380 (Harlan, J. dissenting).

The doctrine of inequality created by the Supreme Court in the Insular Cases stands on the same discredited theoretical footing as that espoused by the majority in Plessy v. Ferguson, 163 U.S. 537 (1896),[14] and which was put to rest by the Supreme Court in Brown v. Board of Education, 347 U.S. 483 (1954). Had the

---

[14] Justice Harlan also dissented, famously, in Plessy. 163 U.S. at 552.

-8-

Supreme Court awaited for the political branches to correct the gross injustice perpetrated by Plessy upon the discrete minority against which it was directed, it is likely that state-sponsored racial segregation would still be with us. Equally on point, it is the judicial branch that is called upon to protect minorities from the otherwise unchecked abuses of a potentially oppressive majority.[15] "[P]rejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and . . . may call for correspondingly more searching judicial inquiry." United States v. Carolene Prods. Co., 304 U.S. 144, 152 n.4 (1938).

Although the political rights of the United States citizens residing in Puerto Rico are at stake, the issue presented is not a "political question" any more than were the rights claimed in Brown. Cf. Marbury v. Madison, 5 U.S. 137 (1802) ("The province of the court is, solely, to decide on the rights of individuals . . . .").

Those born in Puerto Rico have since 1917 been born citizens of the United States. See Jones Act (Puerto Rico), Act of March 2, 1917, § 5, ch. 145, 39 Stat. 951 (1917); 8 U.S.C. § 1402. The right to vote is a fundamental right inherent in citizenship.

_____

[15] See John Stuart Mill, On Liberty 10 (Prometheus ed. 1986) ("'[T]he tyranny of the majority' is now generally included among the evils against which society requires to be on guard.").

*Tashjian* v. *Republican Party*, 479 U.S. 208, 217 (1986). It is fundamental because it is preservative of all other rights by adding the validating imprimatur of the ballot box to the business of government. Furthermore, it has been considered a fundamental right since at least 1886, see *Yick Wo* v. *Hopkins*, 118 U.S. 356, 370 (1886), and repeatedly thereafter in a variety of circumstances, see *Bush* v. *Gore*, 531 U.S. 98, 104 (2000); *Buckley* v. *Valeo*, 424 U.S. 1, 49 n.55 (1976); *Lubin* v. *Panish*, 415 U.S. 709, 721 (1974); *Bullock* v. *Carter*, 405 U.S. 134 (1972); *Phoenix* v. *Kolodziejski*, 399 U.S. 204 (1970); *Harper* v. *Virginia Bd. of Elections*, 383 U.S. 663, 667 (1966); *Reynolds* v. *Sims*, 377 U.S. 533, 561-62 (1964), being variously described as "a right at the heart of our democracy," *Burson* v. *Freeman*, 504 U.S. 191, 198 (1992), and as being "too important in our free society to be stripped of judicial protection," *Wesberry* v. *Sanders*, 376 U.S. 1, 7 (1964). This is particularly relevant in the present circumstances since even under the notorious *Insular Cases*, the Constitution extends fundamental rights to Puerto Rico. See *Balzac*, 258 U.S. at 312-13.

The indefinite disenfranchisement of the United States citizens residing in Puerto Rico constitutes a gross violation of their civil rights as guaranteed by the Fifth Amendment and by international treaties to which our Nation is a signatory. The Fifth Amendment is fully applicable to the actions of the U.S.

Government in Puerto Rico.  Cf. Examining Bd. of Eng'rs v. Flores, 446 U.S. 572 (1976).  An equal protection component, similar to that in the Fourteenth Amendment, is part of the due process clause contained in the Fifth Amendment and serves as a constraint on the United States.  Bolling v. Sharpe, 347 U.S. 497 (1954).  The utter failure of the Government of the United States to protect its citizens in Puerto Rico from continued national disenfranchisement is a violation of due process.

It is also a violation of Article 21 of the Universal Declaration of Human Rights, G.A. Res. 217 A (III), U.N. Doc. A/810 at 71 (1948) ("UDHR"), proclaimed by the member nations of the U.N. General Assembly shortly after World War II.  The UDHR provides that:

> (1)Everyone has the right to take part in the government of his country, directly or through freely chosen representatives.
> . . .
>
> (3) The will of the people shall be . . . expressed in periodic and genuine elections which shall be by universal and equal suffrage
> . . . .

Although the UDHR does "not of its own force impose obligations of international law," Sosa v. Alvarez-Machain, 125 S. Ct. 2739, 2767 (2004), it has been recognized for its "moral authority" by the Supreme Court.  Id.[16]

---

[16]  This Nation's highest court has referred to the provisions of the UDHR on several occasions since its adoption in 1948.  See Knight v. Florida, 528 U.S. 990, 996 (1999) (Breyer, J.,

-11-

The United States has committed itself to specific binding international obligations regarding the right to vote of all of its citizens. The International Covenant on Civil and Political Rights, 999 U.N.T.S. 171 (1967), <u>opened for signature Dec. 16, 1966</u> (entered into force Mar. 23, 1976) (ratified by the Senate April l2, 1992, 138 Cong. Rec. S-4781, S-4783) ("ICCPR"), to which the United States has been a party for the past twelve years, states in clear and unambiguous terms in Article 25 that "[e]very citizen shall have the right and opportunity . . . to vote . . . at genuine periodic elections which shall be by universal and equal suffrage . . . ." Furthermore, Article 2, Para. 1 states that each signatory "undertakes . . . to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant . . . without distinction . . . ." Most

_____

dissenting) (noting U.N. Human Rights Committee decision that ten year delay between death sentence and execution not necessarily a violation of UDHR as informative precedent in Eighth Amendment case); <u>Dandridge</u> v. <u>Williams</u>, 397 U.S. 471, 520 n.14 (1970) (citing UDHR Article 25 as informative "on the issue of whether there is a 'right' to welfare assistance"); <u>Zemel</u> v. <u>Rusk</u>, 381 U.S. 1, 14 n.13 (1965) (citing UDHR Article 13 in discussion of scope of due process); <u>Kennedy</u> v. <u>Mendoza-Martínez</u>, 372 U.S. 144, 161 n.16 (1963) (noting, in rejecting revocation of U.S. citizenship as consequence of remaining abroad to evade military service, the UDHR's guarantee "of the right of every citizen to retain a nationality"); <u>Am. Fed'n of Labor, Ariz. State Fed'n of Labor</u> v. <u>Am. Sash & Door Co.</u>, 335 U.S. 538, 549 n.5 (1949) (Frankfurter, J., concurring) (citing UDHR provision on freedom from mandatory association in context of discussing foreign standards of labor law).

importantly, in Paragraph 2, the signatory nations commit themselves that

> [w]here not already provided for by existing legislati[on], . . . each State Party . . . undertakes to take necessary steps, in accordance with its constitutional processes and with the provisions of the present Covenant, to adopt such legislative or other measures as may be necessary to give effect to the rights recognized in the present Covenant.

Additionally, in Paragraphs 3 (a) and (b), each State Party undertakes "[t]o ensure that any person whose [ICCPR] rights or freedoms . . . are violated shall have an effective remedy," to ensure that such rights are "determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy." Paragraph 3(c) makes clear that these remedies shall be enforced by the "competent authorities."

Those portions of the UDHR that rise to the level of customary international law, see Restatement (Third) of Foreign Relations Law of the United States, Pt. VII, introductory note (1987) ("[A]lmost all States would agree that some infringements of the human rights enumerated in the Declaration are violations of the [U.N.] Charter of customary international law."), in addition to the ICCPR and the obligations established thereunder, are the law of the land. U.S. Const. art. VI, § 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance

-13-

thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land . . . .").

The ICCPR was signed by the United States in 1976 and ratified thereafter by the Senate in 1992. See 138 Cong. Rec. S-4781, S-4783. Although the Senate added an Understanding that the ICCPR would not be self-executing, id., I cannot countenance that this Nation would have committed to the ICCPR by signature and ratification if compliance with the obligations enumerated therein was not contemplated. The duplicity and cynicism that would be implicit if such were the case would be a stain on our national honor and integrity of monstrous proportions. Because I refuse to believe that the United States would so act, I cannot but conclude that there is no legal excuse for continued non-compliance with these agreements.

Although there exists no individual cause of action to enforce the ICCPR in the instant case,[17] I am nonetheless compelled

---

[17] Most courts to address the ICCPR have found that its non-self-executing nature precludes the existence of a private right of action to enforce its provisions. See, e.g., Igartúa I, 32 F.3d at 10 n.1; see also United States v. Duarte-Acero, 132 F. Supp. 2d 1036, 1040 n.8 (summarizing caselaw). Nevertheless, federal courts have found that provisions of the ICCPR can be enforced via the implementing legislation of the Alien Tort Claims Act. See Estate of Cabello v. Fernández-Larios, 157 F. Supp. 2d 1345, (S.D. Fla. 2001) (finding that plaintiff may bring claim under ATCA for violation of ICCPR Article 6 right to life); Ralk v. Lincoln County, Ga., 81 F. Supp. 2d 1372, 1380 (S.D. Ga. 2000) (finding plaintiff could bring claim under ATCA for violation of ICCPR) (relying on Abebe-Jira v. Negewo, 72 F.3d 844 (11th Cir. 1996)).

to recognize that the United States is in violation of its obligation under Article 25 to afford universal suffrage to its citizens. See Restatement (Third) of Foreign Relations Law of the United States § 321 (1987) ("Every international agreement in force is binding upon the parties to it and must be performed by them in good faith.").

The United States has taken some actions to meet some of its obligations both under domestic and international law to validate the right of all citizens to vote in national elections. The Constitution was thus amended in 1961 to allow citizens resident of the District of Columbia, (an unincorporated territory of the United States, as is Puerto Rico), to vote for the offices of President and Vice-President. U.S. Const. amend. XXIII. However, said citizens continue to be represented in Congress on an unequal footing with the U.S. citizens residing in the States, as are, of course, the United States citizens of Puerto Rico.

Furthermore, in 1986, Congress passed the Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. §§ 1973ff-1973ff-6, which allows United States citizens residing outside the United States to vote in federal elections as absentee voters in their

Moreover, at least one court has determined that the individual rights guaranteed by the ICCPR may be raised defensively. Duarte-Acero, 132 F. Supp. 2d at 1040 n.8, aff'd, 296 F.3d 1277 (11th Cir. 2002) (recognizing defense, but determining that procedural requirements of ICCPR do not apply to United States action carried out on foreign territory).

-15-

last state of residence.  But because the statute's definition of "United States" includes Puerto Rico, 42 U.S.C. §§ 1973ff-6(8), the residents of Puerto Rico who would otherwise qualify to vote pursuant to this statute are disqualified.

Since we decided Igartúa II in 2000, the United States has taken no action towards the national enfranchisement of its citizens in Puerto Rico or towards ending the present colonial relationship.  This total inaction is particularly poignant at this moment in our history, when we seek to convince the inhabitants of far-flung places of the world of the democratic process and the validity of its expression through the ballot box.[18]  It is nothing short of ironic that close to 3,500 U.S. citizens from Puerto Rico support these goals by their presence in Iraq and Afghanistan as members of our Armed Forces, while they are themselves denied these rights particularly with regards to the election of their Commander in Chief.  Their presence in these distant lands has not been without some cost.[19]

---

[18]  See David Roche & Carlotta Gall, Afghans Studying the Art of Voting, N.Y. Times, Oct. 4, 2004, at A1 (discussing challenges facing Afghanistan's first-ever democratic elections).

[19]  As of September 28, 2004, twenty U.S. citizens from Puerto Rico have died in Iraq, the 4th U.S. jurisdiction per capita.  Twentieth Puerto Rican Soldier Killed in Iraq, The Associated Press State & Local Wire, Sept. 28, 2004.  Two more have died in Afghanistan. Nearly 3,500 Puerto Ricans in Action in Afghanhistan, Iraq, Puerto Rico Herald, Nov. 21, 2003.  Puerto Rico had the second highest per capita casualty rate in the Nation in the Korean Conflict and the twelfth in the Vietnam War.  Nancy San Martin, A Military History, The Miami Herald, Jan. 21, 2004, available at 2004 WL 56367293.

The total default by the United States of its constitutional and international obligations with respect to the citizens of the United States residing in Puerto Rico, release me from any obligation to give stare decisis recognition to our prior decisions in Igartúa I and Igartúa II. "Our Constitution . . . neither knows nor tolerates classes among citizens," Plessy, 163 U.S. at 559 (Harlan, J. dissenting), and yet what we have in this case is without a question the creation and perpetuation of a class of sub-standard, second-class citizens, with less rights than those enjoyed by the main class of U.S. citizens.

Given the failure by the United States to take steps to rectify this clear violation of a fundamental right, I believe that the courts of the United States are required to take such extraordinary measures as are necessary to protect the discrete groups that are "completely under the sovereignty and dominion of the United States." Cherokee Nation v. Georgia, 30 U.S. 1 (1831) (Marshall, C.J.); see Carolene Prods. Co, 304 U.S. at 152 n.4. The United States citizens residing in Puerto Rico are such a group.

Because the normal avenues of government are not open to the United States citizens who reside in Puerto Rico to end the limitless and unconstitutional (see Downes, 182 U.S. at 380 (Harlan, J. dissenting) colonial condition that deprives these citizens of the equality that should be inherent in United States citizenship, it becomes incumbent upon the judicial branch to take

such extraordinary measures as are necessary and appropriate to protect the rights of this discreet and insular minority. As an initial remedy, I would reverse the judgment of the district court and remand for the entry of a declaratory judgment consistent with the views expressed by me and stating that the United States has failed to meet its obligations under Article 25 of the ICCPR. "This is of the very essence of judicial duty." <u>Marbury</u>, 5 U.S. at 178.

For the above reasons I respectfully dissent from the opinion of my brethren in the majority.